**ALLEN RUSSELL PUBLISHING, INC., Plaintiff,**

v.

**Stanley R. LEVY, et al., Defendants.**

**No. 84 C 9269.**

United States District Court, N.D. Illinois, E.D.

Dec. 5, 1985.

Defrees & Fiske, Chicago, Ill., for plaintiff.

Jack W. Derryberry, Jr., Nashville, Tenn., for defendants.

### MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

Plaintiff Allen Russell Publishing, Inc. ("Russell") brings this diversity action against defendants Timothy J. Nugent ("Nugent") and VII World Wheelchair Games ("Games") for damages arising out of Games' alleged breach of an implied covenant and for both defendants' fraud in the inducement of a contract between Russell and Games. The original complaint was filed on October 24, 1984 and an amended complaint was filed on February 13, 1985. Count I of the amended complaint alleges that Russell, a publisher, and Games, a business organized for the purpose of promoting and conducting a competitive event for wheelchair athletes, entered into a written agreement whereby Russell was to publish and sell the official souvenir program for the competitive event. In Count I, Games is alleged to have implicitly covenanted to organize and conduct the athletic event and breached that covenant by not conducting the wheelchair games. Russell claims it was damaged in the amount of its anticipated profits and the costs incurred in connection with the production and printing of the programs. In Count II, directed against both Nugent, who is an agent of Games, and Games itself, Russell alleges that Nugent, in the course of negotiating the contract between Russell and Games, made certain representations of material fact which were known by Nugent to be false when made. These representations relate to certain financial guarantees that Nugent allegedly made to Russell and to certain assertions concerning the host of the athletic events, the University of Illinois. Finally, Count III, directed against members of the Board of Directors of Games, was dismissed on June 5, 1985 for failure to state a claim upon which relief can be granted.

On May 20, 1985, Russell filed a motion for default against Games for failure to answer or otherwise plead. The court granted the motion and entered a default against Games on May 24, 1985. The default was entered pursuant to Fed.R.Civ.P. 55(a) which authorizes the clerk of the court, and impliedly the court itself, to enter a default against a nonresponding defendant. In its May 24 order, this court set prove-up of damages for September 5, 1985, which date has by subsequent order been extended so that there has not yet been a prove-up and therefore no final judgment by default has been entered as provided by Fed.R.Civ.P. 55(b). On July 29, 1985, Games filed a motion to set aside the entry of default, pursuant to Fed.R. Civ.P. 55(c) which provides that "[f]or good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b)." Because in this case there has not yet been

a default judgment but only an entry of default, the question is whether under the "good cause" standard of Rule 55(c), Games is entitled to have the default entry set aside.

Trial courts have traditionally been granted a substantial amount of discretion in deciding motions to set aside entries of default. *See, e.g., United States v. An Undetermined Quantity of an Article of Drug Labeled as Benylin Cough Syrup,* 583 F.2d 942 (7th Cir.1978); *Rutland Transit Co. v. Chicago Tunnel Terminal Co.,* 233 F.2d 655 (7th Cir.1956). This discretion, however, is not without guidelines. "Thus, in order to have the entry of default set aside, it [is] incumbent upon defendants to show: good cause for their default, quick action to correct it and a meritorious defense to plaintiff's complaint." *Breuer Elecric Manufacturing v. Toronado Systems of America,* 687 F.2d 182, 185 (7th Cir.1982). By contrast, a motion to vacate a default judgment must be analyzed under the principles of Fed.R.Civ.P. 60(b) which requires a similar but more stringent showing than is required under Rule 55(c) for setting aside a mere entry of default. *Chrysler Credit Corp. v. Macino,* 710 F.2d 363, 368 (7th Cir.1983); *Epstein v. Wilder,* 84 C 6293 (N.D.Ill. May 15, 1985) (Getzendanner, J.). Nevertheless, federal courts have interpreted both rules to disfavor defaults and have resolved doubts in favor of having a decision on the merits. *See, e.g., A.F. Dormeyer Co. v. M.J. Sales & Distributing Co.,* 461 F.2d 40 (7th Cir.1972). With these principles in mind, the court finds that Games has amply demonstrated "good cause," "quick action," and a "meritorious defense" so that its motion to set aside the default should be granted.

■ With respect to the question of good cause, Games contends it was "unable to procure an attorney due to its lack of finances and/or conflicts of interest on the part of attorneys who were otherwise willing to represent" Games. Brief in Support of Motion to Set Aside Entry of Default at 1–2. The Chairman of the Board of Directors of Games, B. Dale Wiley, elaborates on this problem by affidavit. Wiley states that after Games had been served with process, and the Board had discussed the issue of legal representation, the Board concluded that none of them "knew of any attorneys that were not either involved in the case or unable to represent [Games] on a pro bono or very limited fee basis." Three firms were specifically contacted by Games on the question of representation. Two had conflicts of interest with Games and could therefore not represent it. One firm could not represent Games at other than a cost that was prohibitive for Games. According to Wiley, during this period Games had funds of no greater than "a few hundred dollars" and had "no expectation of getting any more funds." On June 10, 1985, after this court dismissed Count III, one of the attorneys previously contacted who had claimed a conflict of interest told Wiley that he felt he no longer had a conflict and would be willing to represent Games.

Interestingly, the Seventh Circuit, apparently alone, has been presented with the issue of whether financial difficulty in procuring counsel constitutes good cause. In *Daly v. Stratton,* 304 F.2d 666 (7th Cir.), *cert. denied,* 371 U.S. 934, 83 S.Ct. 306, 9 L.Ed.2d 270 (1962), the district court had dismissed a pro se plaintiff's case for want of prosecution after plaintiff failed to respond to the court's status call. Plaintiff moved to have his case reinstated under Rule 60(b), the more stringent rule, stating that his failure to respond was due to his "financial difficulty in the procurement of counsel," 304 F.2d at 668, and that not being an attorney, he did not have access to the Daily Law Bulletin in which the call of cases was published. *Id.* The district court granted plaintiff's motion, reinstated the case, and denied defendant's subsequent motion to vacate its order setting aside its judgment of dismissal. On appeal to the Seventh Circuit, the court held that plaintiff's motion was brought under Rule 60(b) rather than Rule 59(b). Accordingly, the district court's ruling was considered interlocutory rather than final so the Court

concluded it had no jurisdiction to consider the propriety of the district court's action.

The fact that Daly involved a plaintiff and this case involves a defendant is a distinction of no moment. The penalty for a defendant's failure to defend a case is default; the penalty for a plaintiff's failure to prosecute is dismissal. Default and dismissal are thus the respective penalties for the same conduct by opposite parties. The district court in *Daly* was therefore faced with the same conduct that is at issue here. Unfortunately, the Seventh Circuit never ruled on the propriety of the district court's action of considering financial difficulty relevant to a motion to set aside an entry of default because the Court felt it had no jurisdiction to do so. Recently, however, the Seventh Circuit discussed the *Daly* opinion and in dicta "agree[d] that lack of counsel may sometimes be a factor warranting relief under Rule 60(b)...." *McKnight v. United States Steel Corp.*, 726 F.2d 333, 338 (7th Cir.1984). Although no authority is cited in support of the *McKnight* dicta, the Court may have implicitly relied on *Klapprott v. United States*, 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266, *modified* 336 U.S. 942, 69 S.Ct. 398, 93 L.Ed. 1099 (1949). In *Klapprott*, Justice Black in announcing the judgment of the Court wrote that an indigent defendant's lack of counsel in denaturalization proceedings was a factor justifying relief from a default judgment under Rule 60(b) four years after the judgment was entered. *See* 335 U.S. at 614, 69 S.Ct. at 390.

In light of this precedent, this seems to be an appropriate case for regarding Games' lack of counsel as good cause for Games' default, at least under the less stringent standards of Rule 55(c). Wiley's uncontradicted affidavit clearly states that three separate attempts were made to retain counsel and events at least partially beyond their immediate control (lack of funds and conflicts of interest) prevented those attempts from being successful. These attempts were made prior to the entry of default. Furthermore, Games' difficulty in obtaining counsel was compounded by the absence of any staff during the time that counsel was sought. Ideally, of course, Games should (and could) have informed the court of its financial difficulties prior to its default. However, the performance of this ideal should not be an absolute prerequisite to a finding of good cause since it is not at all certain that this court would have had the power to allow Games, a corporation, to proceed in forma pauperis and receive court-appointed counsel under 28 U.S.C. § 1915, even if Games had so petitioned this court. *See Honolulu Lumber Co. v. American Factors, Ltd.*, 265 F.Supp. 578 (D.Hawaii 1966) (corporation not a "person" within section 1915); *MOVE Organization v. United States Dept. of Justice*, 555 F.Supp. 684 (E.D.Pa. 1983) (an artificial entity cannot be a "person" within this section); *but see Harlem River Consumers Cooperative, Inc. v. Associated Grocers of Harlem, Inc.*, 71 F.R.D. 93 (S.D.N.Y.1976) (plaintiff corporation in antitrust action considered a "person" where corporation was not profit and the corporation was formed for the public interest purpose of providing quality food to low-income persons at fair prices). Thus, Games' lack of counsel was not due to its lack of exercising reasonable diligence in attempting to procure representation. Despite its financial difficulties, Games made those attempts which could reasonably be expected of it under the circumstances to procure counsel prior to default. Accordingly, the court finds that Games' lack of counsel due to financial difficulties constitutes good cause.

The only authority Russell cites to the contrary is contained in *Usery v. Weiner Bros., Inc.*, 70 F.R.D. 615 (D.Conn.1976). In *Usery*, the district court denied defendant's motion to vacate a default judgment under Rule 60(b) where the defendant claimed, among other things, that he lacked counsel in the original proceeding. In rejecting the defendant's argument that he lacked counsel, the court did not make clear whether the defendant also had no funds with which to hire counsel. However, the district court did make clear that it was relying on *Rinieri v. News Syndi-*

*cate Co.,* 385 F.2d 818, 823 (2d Cir.1967), also cited by Russell. *Rinieri* did *not* hold that lack of counsel could not justify vacating a default. Rather, *Rinieri* held that a party who is represented by counsel, as the plaintiff was in that case, cannot use his impecuniosity as a reason for refusing to prosecute the suit, especially when the party can easily proceed in forma pauperis. Of course, here, Games was in fact unrepresented by counsel and, as explained above, may not have been able to proceed in forma pauperis. Furthermore, the parties in *Rinieri* and *Usery* had waited over two years and eleven months, respectively, to move to vacate the defaults, as opposed to the nine-week delay here. Thus, Russell's authority, if it is indeed contrary, is not applicable here.

■ This brings the court to the second factor relevant to a Rule 55(c) determination, the "quickness" with which Games has sought to set aside the default. As just stated, Games filed its motion about nine weeks (on July 29, 1985) after this court entered the default on May 24, 1985. When there has been good cause for delay, and there has been no prejudice to the other party, the Seventh Circuit has upheld a ten-week delay as sufficiently quick to warrant vacating a default judgment. *See Smith v. Widman Trucking & Excavating, Inc.,* 627 F.2d 792 (7th Cir.1980). The timing in this case fits nicely within the *Smith* holding. As just discussed, there was good cause for the delay here and the delay was only nine weeks. The only prejudice alleged here is the expense plaintiff has already incurred with respect to the discovery related to the prove-up and damages issue. This discovery will become useless to plaintiff if this court vacates the default and defendant Games actually prevails in this action. In the time between the entry of default and Games' July 29 motion to set aside the default, Russell could not have reasonably foreseen the possibility that the default might be vacated. Therefore, if Games ultimately prevails on the question of its liability to Russell, all of the prove-up and damages-related discovery that Russell undertook between May 24 and July 29 will be taxed to Games. This will take care of the only prejudice which Russell has claimed it will suffer if the default is set aside. Russell has made no claims that the delay has resulted in lost evidence or faded memories or other forms of prejudice that cannot similarly be addressed by taxing certain costs to Games. Accordingly, the court concludes that Games took sufficiently "quick action" in this case to justify setting aside the default.

■ On the final question of whether Games has stated a meritorious defense, the uniform rule is that a defense is meritorious when the "allegations of defendant's answer, if established on trial, would constitute a complete defense to the action." *United States v. $55,518.05 in U.S. Currency,* 728 F.2d 192, 195 (3d Cir.1984) (quoting *Tozer v. Charles A. Krause Milling Co.,* 189 F.2d 242, 244 (3d Cir.1951)). *See also Central Operating Co. v. Utility Workers of America,* 491 F.2d 245, 252 n. 8 (4th Cir.1974) (meritorious defense established when union officer stated facts which, if believed, would constitute a defense to the action); *Gomes v. Williams,* 420 F.2d 1364 (10th Cir.1970) (attorney's statement "we do have a good defense to the claim itself, but especially we have a good defense to any allegation of fraud" held to be insufficient to establish a meritorious defense); *Marziliano v. Heckler,* 728 F.2d 151 (2d Cir.1984) (stating there are "substantial issues of law" not sufficient). Here, Games argues it has, by its answer, established four specific theories of defense: (1) specific denials and contrary allegations of the facts Russell alleged to establish liability; (2) actions taken by Nugent in excess of his agency authority (thereby defeating *respondeat superior* liability of Games on Count II); (3) failure of Russell to seek arbitration as required by the contract; and (4) contractual discharge by impossibility and frustration of purpose. There may be some question as to whether the third theory of defense is legally sufficient. However, it is not necessary to resolve this question now since the remaining

three defenses are substantial and provide Russell with sufficient notice to be considered meritorious. In its answer, with respect to Count II, Games specifically states that Nugent did not have authority to covenant that the games would be conducted, nor to guarantee that Russell would be financially successful, or that the University of Illinois guaranteed the games. With respect to Count I, Games has alleged that despite Games' best efforts, certain events (specifically, the failure of its fundraising efforts and action taken by the University of Illinois), led to the cancellation of the games, which cancellation the parties had contemplated as a frustrating event and one that would make holding the games impossible, thereby relieving Games of liability. Finally, also with respect to Count I, Games not only specifically denies certain material paragraphs in the amended complaint, but also alleges contrary facts which, if proven, would constitute a defense to liability. Thus, on all three defenses, Games has not simply satisfied itself with the "general denials and conclusory statements" which the court found insufficient in *Chandler Leasing Corp. v. UCC, Inc.*, 91 F.R.D. 81, 84 (N.D.Ill.1981) (general allegations of fraud defense insufficient without allegation of factual basis). Instead, Games has alleged facts which, if believed, would make out the defenses of lack of agency authority, contractual frustration and impossibility, and absence of facts necessary to contractual liability.

■ In sum, Games has supplied this court with good cause for its default, quick action in its motion to set the default aside, and a meritorious defense to the complaint. The motion is therefore granted. There is one remaining matter, however. Russell has argued, on the authority of *Savin Corp. v. C.M.C. Corp.*, 98 F.R.D. 509, 513 (N.D.Ohio 1983) and *In re Arthur Treacher's Franchisee Litigation*, 92 F.R.D. 398, 419 (E.D.Pa.1981), that Russell is entitled to recover from Games the costs and attorney's fees incurred in the presentation of their motion for default judgment in the event that Games' motion to vacate is

granted. *Savin* and *Treacher's* did award costs and attorney's fees to the unsuccessful plaintiff opposing the defendant's motion to set aside a default entry. However, the costs and fees awarded there related to only the plaintiff's costs in preparing its defeated motion for a default judgment. Plaintiff here has not prepared a motion for a default judgment; plaintiff has only moved for entry of default, which motion was made on May 24. The result in *Savin* and *Treacher's* was based on the fact that the courts there simultaneously granted defendants' motion to set aside an entry of default and denied plaintiffs' motion for a default judgment. When the plaintiffs in those cases had prepared their motions for default judgment, those courts had already entered a default against the defendants. Thus, the plaintiffs were entitled to indulge themselves in the assumption that since their motions for default judgment would likely be granted, it would therefore be worth the expense to prepare those motions. When the plaintiffs were understandably surprised that the previously unresponsive defendants were contesting the defaults, the plaintiffs were then entitled to receive the costs and fees they might otherwise have not incurred by not moving for a default judgment had they had some reason to anticipate the arrival of responsive plaintiffs.

These factors do not play any such role here. Russell has not presented any motion for a default judgment. The prove-up hearing has not yet been held and any of the costs or fees associated with that hearing have not yet been incurred. Of course, some discovery has taken place, and the costs and fees associated with that have already been taxed to Games. If Russell is also asking this court to tax to Games the costs and fees associated with its opposition to Games' current motion, it has not explicitly asked for such, and in any event, Russell provides this court with no authority to do so. There is only authority for taxing to defendant the costs of a defeated but reasonably made motion for default

judgment; not for opposing plaintiff's motion to set aside a default.

### Conclusion

Defendant Games' motion to set side the entry of default is granted. If Games ultimately prevails against plaintiff Russsell on the merits, the costs and reasonable attorney's fees Russell incurred from May 24, 1985 through July 29, 1985 in connection with prove-up and damages discovery will be taxed against Games.

It is so ordered.